# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 5, 2011 Session

## KNOX COUNTY EX REL. ENVIRONMENTAL TERMITE & PEST CONTROL, INC. v. ARROW EXTERMINATORS, INC. ET AL.

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Knox County**
**No. 158430-2      Daryl Fansler, Chancellor**

---

**No. E2007-02827-SC-R11-CV - Filed July 20, 2011**

---

This appeal involves a claim under Tennessee's False Claims Act. A local vendor of termite control services became suspicious that two of its competitors had overbilled Knox County for termite control services provided to Knox County's public schools. After confirming its suspicions by obtaining and reviewing public records and by hiring an attorney and private investigator, the vendor presented a detailed report of its findings to county officials who were unaware that the overbilling had occurred. When the County delayed taking remedial action, the vendor filed a qui tam suit authorized by Tenn. Code Ann. § 4-18-104(c) (2005) in the Chancery Court for Knox County. The County joined the vendor's lawsuit and eventually settled with both of the companies named as defendants in the vendor's lawsuit. When the qui tam plaintiff sought a share of the County's settlement with one of the defendants, the County asserted that the qui tam plaintiff was not eligible to receive any of the settlement proceeds. The trial court heard the matter without a jury and held that the qui tam plaintiff was an "original source" for the purpose of Tenn. Code Ann. § 4-18-104(d)(3)(A) and, therefore, was entitled to receive 28% of the settlement proceeds or $71,546.46. The Court of Appeals affirmed the trial court's conclusion that the qui tam plaintiff was entitled to recover 28% of the value of the settlement proceeds but remanded the case for the purpose of redetermining the value of the settlement proceeds. *In re Knox Cnty., Tenn. ex rel. Envtl. Termite & Pest Control, Inc.*, No. E2007-02827-COA-R3-CV, 2009 WL 2144478 (Tenn. Ct. App. July 20, 2009). The County filed a Tenn. R. App. P. 11 application on the sole issue of whether the qui tam plaintiff is eligible to recover a portion of the settlement proceeds. We affirm the decisions of both the trial court and the Court of Appeals that the qui tam plaintiff is an "original source" and, therefore, is eligible to receive a portion of the proceeds from the County's settlement with one of the vendors.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Joseph G. Jarret, Knox County Law Director; Daniel A. Sanders, Deputy Law Director, Knoxville, Tennessee, for the appellant, Knox County, Tennessee.

David S. Wigler, Knoxville, Tennessee, for the appellee, Environmental Termite and Pest Control, Inc.

**OPINION**

**I.**

Knox County contracts with private vendors for termite control services at its eighty-four public schools. Prior to November 2000, Arrow Exterminators, Inc. ("Arrow") had the contract. When the contract was put out for bids in November 2000, both Environmental Termite & Pest Control, Inc. ("Environmental") and Allied Pest Control ("Allied") submitted bids for the work. The County awarded the contract to Allied and agreed to pay Allied $2.90 per linear foot treated.

After Allied won the contract, Edward Howard, Environmental's president, noticed that the County's decision to award the contract to Allied coincided with Allied's decision to hire Fred Thomas away from Arrow. Mr. Howard knew that Mr. Thomas was a close friend of Floyd Swann, a county employee involved with evaluating and awarding the termite control contract. Based on his prior dealings with both individuals, Mr. Howard became suspicious that Mr. Swann was actively directing the contracts to Mr. Thomas's employers. From his vantage point as an insider in the termite control industry in the Knoxville area, Mr. Howard also became concerned about the perfunctory manner in which the County had been reviewing the bills submitted by both Arrow and Allied for termite control services.

In December 2000, Mr. Howard's suspicions about the County's handling of the termite control contracts prompted him to look into the matter further. He retained Daniel F. McGehee, a Knoxville attorney who had performed legal work for Environmental in the past, to advise him how to proceed.

On December 13, 2000, acting on Mr. McGehee's direction, Cheri Coldwate, Environmental's office manager, requested the Knox County Purchasing Division to provide her with information relating to the payments that the Knox County schools had made over the past four years for conventional termite treatments, bait elimination treatments, spot

treatments, and contract renewals. At the same time, Environmental retained a private investigator to measure the footprints of all the buildings at the County's schools.

On January 25, 2001, Ms. Coldwate mailed Mr. McGehee her analysis of the data contained in the records she received from Knox County. She noted two irregularities in particular. First, she noted that the bills submitted by Arrow and Allied had not received the same level of scrutiny that Environmental's bills had received on its pest control contracts. Second, she noted that the actual number of linear feet of the County's school buildings requiring treatment and the contract price per linear foot was greatly exceeded by the amount of the bills submitted both by Arrow and by Allied. Ms. Coldwate specifically discussed the bills for services at eight different schools and stated that her analysis indicated that the vendors had overbilled the County for these services between $3,000 and $16,000 per school.

Based on the purchasing and payment records obtained from the County and on Ms. Coldwate's analysis, Mr. McGehee became convinced that Mr. Swann was paying the invoices for termite services without reviewing them and, as a result, that the County was being significantly overbilled. In January 2001, he met with the County's Director of Finance and Administration, two representatives of the County purchasing department, and two lawyers from the Office of the Knox County Law Director. Mr. McGehee informed these officials that he was acting on behalf of Environmental and that Environmental's analysis of the billing and payment records indicated that Arrow and Allied were significantly overbilling the County. Prior to their meeting with Mr. McGehee, none of the officials were aware of the possibility that the County was being overbilled for termite control services.

Following the January 2001 meeting, Mr. McGehee provided Knox County with an extensive and thoroughly documented report, including twenty-two exhibits, describing the details of Allied's and Arrow's fraudulent billing practices. The report concluded that the County began to receive fraudulent bills in 1997 and that Mr. Swann arranged to pay these bills more promptly than the bills of other vendors.

On February 8, 2001, Mr. McGehee met again with the County officials with whom he had met in January 2001. The Knox County Law Director also attended this meeting. Mr. McGehee provided the officials with copies of Environmental's detailed report. According to Mr. McGehee, the County officials "were pretty much stunned that somebody had taken the time to go back and research in such detail all of the false billings that were there."

The participants in the February 8, 2001 meeting decided not to release Environmental's detailed report. The County officials were concerned that releasing the report would draw the media's attention, and they also desired to have an opportunity to

-3-

request the District Attorney General to determine whether any criminal wrongdoing had occurred.[1] In addition, the participants agreed that the County's Director of Finance and Administration would obtain additional records, particularly the records regarding $80,000 in payments to Arrow for Sentricon service in 1998. The County officials also agreed to keep Mr. McGehee informed of their findings.

On February 28, 2001, after consulting with the Director of Finance and Administration, Mr. McGehee informed the County's external auditor, who was auditing the County schools, of the suspected irregularities regarding the billing and payments for termite control services at the County's schools. In March 2001, the auditor informed Mr. McGehee that the scope of her audit was not broad enough to include the matter and directed him back to the County Law Director.

Following the flurry of activity in late 2000 and the first two months of 2001, the inquiry into the irregularities in the billing and payment for termite control services at the County's schools languished for more than one year. Mr. Howard became increasingly frustrated by the County officials' failure to act. Accordingly, to move the process forward, he talked with members of the Knox County Commission to apprise them of the results of Environmental's investigation into the overbilling by Arrow and Allied.

As a result of the information provided by Mr. Howard, members of the Knox County Commission called for an internal audit of the County schools. In a report released on April 9, 2003, the Knox County Department of Internal Audit found more than $270,000 of overbilling by Allied and Arrow. This audit report was the first time that the overbilling problem was made public. The audit report understandably attracted the attention of the local news media.

The Superintendent of Schools took strong issue with the audit findings. He attributed the billing problems to shortcomings in the contracts and to the discretionary decisions of County purchasing employees to change the terms of the contracts to accommodate changed circumstances. He also denied that any County officials or service providers had acted improperly and insisted that no action should be taken against the termite control service providers.

The County Law Director continued to make no effort to recover the overpayments from Arrow and Allied. For his part, Mr. Howard "was absolutely furious at that point that nothing was being done . . . . He was livid about the fact that Knox County . . . was not

_____

[1]The Knox County District Attorney General's Office ultimately did not find a sufficient basis for moving forward with criminal prosecution against any of the individuals or entities involved.

doing anything to recover the money." At Mr. Howard's request, Mr. McGehee met again with the County Law Director to encourage him to take steps to recover the overpayments.

Like Mr. Howard, the members of the Knox County Commission became concerned about the County Law Director's inaction. They sent a letter to the County Law Director on May 5, 2003, expressing their concerns and inquiring whether they had standing to pursue a recovery on their own.

On June 13, 2003, the Department of Audit aggressively responded to the school superintendent's criticism of the audit findings. Characterizing the superintendent's position as "somewhat puzzling," the auditor insisted that the superintendent's "response appears to be an attempt to cover up embarrassing misconduct by its employees, give tacit approval to unethical practices and further stonewall attempts to recover overpayments." In addition, the auditor asserted that "based on the questionable . . . response and the presence of fraud indicators (red flags) during our review, we recommend the review be expanded into a fraud investigation." The auditor also suggested that the matter should be referred to the Knox County Sheriff for further investigation.

The Knox County Board of Education broke with its superintendent on June 16, 2003, by unanimously passing a resolution authorizing the County Law Director to seek reimbursement of any overpayments Arrow had received. The Board also requested the Knox County Sheriff to conduct a fraud investigation.

In a letter to Mr. McGehee dated June 17, 2003, the County Law Director stated that he planned to begin discussions with Arrow regarding reimbursement of the overpayments and that he intended to proceed with litigation if necessary. He also informed Mr. McGehee that Allied had offered to give the County a credit of over $40,000. While the County Law Director believed that this offer adequately addressed Allied's overbilling, he told Mr. McGehee that he intended to investigate further.

Despite these assurances, Mr. McGehee had little confidence that the County Law Director planned to pursue the overpayments very aggressively. Around this time, Mr. McGehee became aware of the False Claims Act that had been enacted in 2001 to authorize private citizens to file qui tam suits as a means to address fraudulent billing like that uncovered by Environmental.[2] Mr. Howard authorized the filing of a qui tam action after consulting with Mr. McGehee and another attorney who had been retained to assist with the litigation.

_____

[2]Act of May 31, 2001, ch. 367, 2001 Tenn. Pub. Acts 850, 850-64 (codified at Tenn. Code Ann. § 4-18-101 to -108 (2005)).

-5-

On June 20, 2003, Environmental filed a qui tam action on behalf of Knox County in the Chancery Court for Knox County against Arrow and Allied. The case was filed under seal and in camera. Environmental filed a second complaint on June 24, 2003, but did not place it under seal. The County Law Director responded by filing his own suit against Arrow and Allied and by seeking dismissal of Environmental's complaint. He later changed course and filed notice in Environmental's proceeding that he intended to intervene in accordance with Tenn. Code Ann. § 4-18-104(c)(7)(B).

Environmental filed motions and briefs in response to the County's changing positions. In an effort to bring some order to the process, the trial court filed orders steering Environmental and the County to consolidate the County's lawsuit with Environmental's qui tam suit. These orders left the County in control of the consolidated suit but permitted Environmental to continue to participate in the proceeding.

After two years of litigation, the trial court conducted a judicial settlement conference on November 10, 2005. As a result of this conference, all claims involving the overpayments to Allied were settled, along with Environmental's statutory claim to a share of the settlement proceeds[3] and the payment of its attorney's fees.[4] In addition, Knox County and Arrow resolved their dispute with an agreement that Arrow would install Sentricon systems at all Knox County school buildings and monitor these systems for one year at no cost to the County. No agreement was reached regarding Environmental's right to recover a portion of the value of this settlement or its attorney's fees. While Environmental did not disagree with the reasonableness of the settlement, it objected to preserve its right to recover a portion of the settlement and its attorney's fees.

---

[3]Tenn. Code Ann. § 4-18-104(g)(2) provides, in part, that

> If the state or political subdivision proceeds with an action brought by a qui tam plaintiff under subsection (c), the qui tam plaintiff shall, subject to subdivisions (g)(4) and (5), receive at least twenty-five percent (25%) but not more than thirty-three percent (33%) of the proceeds of the action or settlement of the claim, depending upon the extent to which the qui tam plaintiff substantially contributed to the prosecution of the action.

[4]Tenn. Code Ann. § 4-18-104(g)(8) states that

> If the state, political subdivision, or the qui tam plaintiff prevails in or settles any action under subsection (c), the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees. All expenses, costs, and fees shall be awarded against the defendant and under no circumstances shall they be the responsibility of the state or political subdivision.

Arrow and Environmental later reached an agreement with regard to the payment of Environmental's attorney's fees. Accordingly, the trial court approved the parties' various settlement agreements and noted that Environmental had reserved its rights as a qui tam plaintiff to claim a share of the settlement between the County and Arrow. The County and Environmental could not resolve their disagreement on this issue, and the litigation continued.

Knox County insisted that Environmental was not entitled to a share of its settlement with Arrow because the Sentricon installation and monitoring agreement did not constitute the "proceeds of the action or settlement of the claim" under Tenn. Code Ann. § 4-18-104(g)(2). Following a hearing on February 5, 2007, the trial court entered an order on February 6, 2007, rejecting the County's argument, and scheduled a hearing for August 8, 2007, to determine the value of the settlement and the amount of Environmental's share.

During the six months preceding this hearing, the County changed course again and decided to challenge Environmental's qualifications as a qui tam plaintiff. Thus, at the August 8, 2007 hearing, the trial court heard evidence and argument not only with regard to the value of the settlement between the County and Arrow but also with regard to Environmental's qualifications to bring a qui tam action. In an August 31, 2007 memorandum opinion, the trial court rejected the County's claim that Environmental was not qualified to bring a qui tam action. The court also determined that the value of the settlement between the County and Arrow was $255,523.07 and that Environmental was entitled to recover 28% of the value of the settlement or $71,546.26.

Environmental took issue with the amount of the qui tam award in a Tenn. R. Civ. P. 59.04 motion filed on September 25, 2007. The trial court entered an order denying Environmental's motion on December 4, 2007. Environmental filed a timely notice of appeal on December 13, 2007.

Both parties took issue with the trial court's decision, collectively presenting five issues to the Court of Appeals. The County insisted that the trial court had erred by concluding that Environmental was entitled to pursue a qui tam claim and by concluding that the Sentricon services Arrow agreed to provide the County to settle the overbilling claim were proceeds of a settlement. Environmental asserted (1) that the evidence did not support the trial court's calculation of the value of the settlement between the County and Arrow, (2) that it was entitled to more than 28% of the value of the settlement, and (3) that the trial court had erroneously required it to support its claim using a higher burden of proof than the statute required.

The Court of Appeals handed down its opinion on July 20, 2009. *In re Knox Cnty., Tenn. ex rel. Envt'l Termite & Pest Control, Inc.*, No. E2007-02827-COA-R3-CV, 2009 WL 2144478 (Tenn. Ct. App. July 20, 2009). The Court rejected the County's arguments that Environmental was not qualified to be a qui tam plaintiff[5] and that the Sentricon services that Arrow had agreed to provide to settle the overbilling claim were not proceeds from a settlement upon which qui tam payments could be calculated.[6] Turning to Environmental's issues, the Court of Appeals determined that, applying the trial court's reasoning, the value of the settlement between the County and Arrow was $299,961.87 rather than $255,523.07, and that the trial court had erred by discounting "the extent the County benefitted from" the services required by the settlement at schools that already had Sentricon systems.[7] Even though the Court of Appeals was "inclined to award a higher percentage of recovery" to Environmental, it concluded that the trial court did not err by deciding to award 28% of the value of the settlement.[8] Finally, because it was remanding the case, the Court of Appeals sidestepped Environmental's burden of proof issue and suggested that the trial court "keep in mind that the *qui tam* plaintiff has the ultimate burden to prove the value of the settlement proceeds by a preponderance of the evidence," not by a heightened standard of proof.[9]

Knox County filed its application for permission to appeal on October 12, 2009, presenting only one issue – whether the lower courts erred by determining that Environmental was an original source of the information regarding the overbilling for termite services under Tenn. Code Ann. § 4-18-104(d)(3)(A) and was, therefore, qualified to recover a share of the proceeds of the settlement between Arrow and the County under the False Claims Act. All the other issues that were contested in the lower courts are not before us on this appeal.

## II.

Unless otherwise required by statute, we review a trial court's findings of fact in civil cases tried without a jury de novo based upon the record before the trial court with an accompanying presumption that the trial court made correct findings of fact unless the

---

[5] *In re Knox Cnty., Tenn. ex rel. Envt'l Termite & Pest Control, Inc.*, 2009 WL 2144478, at *11.

[6] *In re Knox Cnty., Tenn. ex rel. Envt'l Termite & Pest Control, Inc.*, 2009 WL 2144478, at *12.

[7] *In re Knox Cnty., Tenn. ex rel. Envt'l Termite & Pest Control, Inc.*, 2009 WL 2144478, at *13-14, *16.

[8] *In re Knox Cnty., Tenn. ex rel. Envt'l Termite & Pest Control, Inc.*, 2009 WL 2144478, at *15.

[9] *In re Knox Cnty., Tenn. ex rel. Envt'l Termite & Pest Control, Inc.*, 2009 WL 2144478, at *16.

evidence preponderates to the contrary. Tenn. R. App. P. 13(d). We do not afford the same deference to a trial court's conclusions of law. *Blackburn v. Blackburn,* 270 S.W.3d 42, 47 (Tenn. 2008). To the contrary, we review a trial court's decisions on questions of law de novo with no presumption of correctness. *Graham v. Caples*, 325 S.W.3d 578, 581 (Tenn. 2010). Statutory construction and the application of a statute to the facts present questions of law which are reviewed de novo without a presumption of correctness. *Gautreaux v. Internal Med. Educ. Found., Inc.*, 336 S.W.3d 526, 531 (Tenn. 2011).

## III.

The concept of permitting private citizens to pursue claims on behalf of the government has centuries-old roots in the common law and has been recognized in Tennessee for almost two hundred years. These proceedings, commonly referred to as qui tam[10] suits, began as an early method of Thirteenth Century forum shopping.[11] At that time, the royal courts heard only claims affecting the Crown's interests.[12] By bringing their claim in the Crown's name as well as their own and by asserting the interest of both in the matter, litigants were able to bring their cases in the royal courts.[13] This practice waned in the Fourteenth Century with the expansion of the royal courts' jurisdiction to include claims involving private wrongs.[14]

While the use of common-law qui tam suits declined in England during the Fourteenth Century, Parliament was expanding the statutory availability of these suits. Parliament enacted statutes that permitted two varieties of qui tam suits – (1) "those that allowed injured

[10]The phrase "qui tam" is a shortened reference to the Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur" which means "who pursues this action on our Lord the King's behalf as well as his own." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000).

[11]Paul E. McGreal & DeeDee Baba, *Applying Coase to Qui Tam Actions Against the States*, 77 Notre Dame L. Rev. 87, 117 (2001) ("McGreal & Baba"); Patricia Meador & Elizabeth S. Warren, *The False Claims Act: A Civil War Relic Evolves into a Modern Weapon*, 65 Tenn. L. Rev. 455, 458 (1998).

[12]Stroud Francis Charles Milsom, *Studies in the History of the Common Law* 181 (1985).

[13]*See, e.g.*, *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. at 774; John Martinez, *Getting Back the Public's Money: The Anti-Favoritism Norm in American Property Law*, 58 Buff. L. Rev. 619, 628 (2010) ("Martinez"); Tipton F. McCubbins & Tara I. Fitzgerald, *As False Claim Penalties Mount, Defendants Scramble for Answers Qui Tam Liability, 31 U.S.C. § 3729 et seq.*, 62 Bus. Law. 103, 104 (2006).

[14]Martinez, 58 Buff. L. Rev. at 628; Note, *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 85.

parties to sue in vindication of their own interests (as well as the Crown's)" and (2) "those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves."[15]  To promote the enforcement of national laws, particularly those contrary to the interests of the local authorities, Parliament empowered self-interested citizens to file qui tam actions to enforce national laws.[16]

What began as a trickle of qui tam legislation eventually became a flood,[17] as "[t]he number of statutes, old and new, in which the public at large was encouraged to enforce obedience to statutes by the promise of a share of the penalty imposed for disobedience [became] very large."[18]  Accordingly, Parliament provided for bounties and forfeitures as a means of regulatory enforcement for various commercial activities, including price restrictions, the sale of goods after the closing of a fair, and the sale of defectively tanned leather.[19]  Similar statutory remedies were used to police the conduct of public officials and to ensure the integrity of governmental processes.[20]

Colonists in the New World carried forward Parliament's practice of enacting qui tam statutes.  These statutes date at least as far back as a 1692 law in New York.[21]  They were a natural fit during the colonial and early American period because the fledgling governments lacked the ability to enforce all their laws.[22]  The first Congress of the United States enacted qui tam statutes authorizing bounties in a wide variety of contexts, including misfeasance in

---

[15] *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. at 775; *see also* McGreal & Baba, 77 Notre Dame L. Rev. at 117-18.

[16] *See* J. Randy Beck, *The False Claims Act and the English Eradication of Qui Tam Legislation*, 78 N.C. L. Rev. 539, 567-73 (2000) ("Beck").

[17] Beck, 78 N.C. L. Rev. at 570.

[18] 4 Sir William S. Holdsworth, *A History of English Law* 356 (1924).

[19] Beck, 78 N.C. L. Rev. at 567-71; *see also* Craig Deutsch, Note, *Restoring Truth: An Argument to Remove the Qui Tam Provision from the False Marking Statute of the Patent Act*, 11 Minn. J.L. Sci. & Tech. 829, 831 (2010) ("Deutsch").

[20] Beck, 78 N.C.L. Rev. at 572-73; *see also* Deutsch, 11 Minn. J.L. Sci. & Tech. at 831.

[21] Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 2:5 (2010) ("Sylvia").

[22] *See* Sylvia, at § 2:5.  Often, "the law left it to private persons, to enforce what regulation there was. If no one brought a law suit, or complained to the district attorney about some violation, nothing was done." Lawrence M. Friedman, *A History of American Law* 164–65 (1973).

census taking, the avoidance of paying import duties on liquor, unlicensed trade with Native Americans, and unlawful trades or loans by Bank of the United States subscribers.[23]

From the formation of the United States, there has never been a time when there was not at least one federal qui tam law on the books.[24] By the mid-Nineteenth Century, however, the common-law variety of qui tam suits had become extinct in the United States, and the traditional statutory variety was in declining use.[25] It was during the Civil War that Congress enacted the first federal False Claims Act – the precursor to the modern federal and state qui tam laws.[26] While the impetus for the False Claims Act was the massive frauds being perpetrated against the federal government by contractors supplying goods and services to the Union Army,[27] the Act itself broadly addressed any fraud committed against the government and enlisted the help of private citizens to root out the malfeasance.[28]

The federal courts recognized that the False Claims Act was

> intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side, and should be construed accordingly. It was passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the treasury is to make the perpetrators of them liable to actions by

---

[23]Sylvia, at § 2:5; Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341, 342 & n.3 (1989); Harold J. Krent, *Fragmenting the Unitary Executive: Congressional Delegations of Administrative Authority Outside the Federal Government*, 85 Nw. U. L. Rev. 62, 92 n.95 (1990).

[24]Myriam E. Gilles, *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights*, 100 Colum. L. Rev. 1384, 1421 n.156 (2000).

[25]*See* Francis E. Purcell, Jr., *Qui Tam Suits Under the False Claims Amendments Act of 1986: The Need for Clear Legislative Expression*, 42 Cath. U. L. Rev. 935, 939-40 (1993)

[26]*See* Aaron R. Petty, Note, *How Qui Tam Actions Could Fight Public Corruption*, 39 U. Mich. J.L. Reform 851, 865 (2006).

[27]Gary W. Thompson, *A Critical Analysis of Restrictive Interpretations Under the False Claims Act's Public Disclosure Bar: Reopening the Qui Tam Door*, 27 Pub. Cont. L.J. 669, 672-73 (1998).

[28]*See, e.g.*, Sylvia, at § 1:14, 2:2; Kevin M. Comeau, *False Certification Claims in Light of* Allison Engine *and False Claims Act Amendments Introduced in the 111th Congress*, 18 Fed. Circuit B.J. 491, 493 (2009); *see generally* Beverly Cohen, *Trouble at the Source: The Debates over the Public Disclosure Provisions of the False Claims Act's Original Source Rule*, 60 Mercer L. Rev. 701, 702-10 (2009) (addressing the history of the qui tam provisions of the False Claims Act).

private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.

*United States v. Griswold*, 24 F. 361, 366 (D. Or. 1885); *see also Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997); *United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 24 (1st Cir. 2007) (characterizing the False Claims Act as being "intended to aid the government in discovering fraud and abuse 'by unleashing a posse of *ad hoc* deputies to uncover and prosecute frauds against the government'") (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1st Cir. 2004)).

The federal courts have struggled mightily with interpreting and applying the federal False Claims Act, and the United States Congress has expressed frustration with some of these judicial interpretations. As one United States District Court has noted:

> [t]he False Claims Act . . . has spawned a great amount of litigation throughout the United States. There are serious disputes among and within the judicial circuits who have confronted the issues raised by the statute as to the proper interpretation of various clauses of the statute. Within the Third Circuit there have been several extensive dissents by members of the Court of Appeals panels. There seems to be no unanimity both among and within individual circuits as to when claims are "based upon" public disclosures, what constitutes a public disclosure, when and under what circumstances a qui tam relator must first inform the government of the claims, the extent of the factual information that must be provided to the government prior to filing the qui tam action, when a qui tam action must be filed where there has been a public disclosure, what are the requisites to be classified as an "original source," when a claim is "primarily based upon" prior public disclosures and many other issues that arise under the statute. These questions will continue to plague and perplex litigants and the courts.

*United States ex rel. Merena v. Smithkline Beecham Corp.*, 114 F. Supp. 2d 352, 371-72 (E.D. Pa. 2000). Noting the existence of the conflicting interpretations of the provisions of the False Claims Act, another United States District Court has stated that it "sympathizes with anyone litigating under the False Claims Act." *United States ex rel Montgomery v. St. Edward Mercy Med. Ctr.*, No. 4:05-CV-00899 GTE, 2008 WL 110858, at *3 & n.6 (E.D.

Ark. Jan. 8, 2008). The Senate Report for *The False Claims Act Correction Act of 2008* similarly expressed frustration with the widely varying and errant nature of many of the judicial interpretations of the various provisions of the False Claims Act by the federal courts, including some decisions by the United States Supreme Court. *See* S. Rep. No. 110–507, at 9 (2008).

To a great extent, the federal courts' conflicting interpretations of the federal False Claims Act arise from the tension inherent in all qui tam suits. These proceedings must "strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud." *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992); *see also United States ex rel. Smart v. Christus Health*, 626 F. Supp. 2d 647, 651 (S.D. Tex. 2009). To accomplish this end, the federal False Claims Act contains a jurisdictional bar in 31 U.S.C. § 3730(e)(4)(A) (Oct. 2010 Supp.)[29] that is intended

---

[29]Prior to being amended in 2010, the jurisdictional bar on qui tam suits since 1986 had been stated as follows:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C.A. § 3730(e)(4) (2003); *see also* False Claims Amendment Act of 1986, Pub. L. No. 99-562, § 3 (1986).

Responding to some of the interpretive difficulties experienced by the federal courts, Congress has amended 31 U.S.C. § 3730(e)(4) which, in its current form, states that

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed --
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an

(continued...)

-13-

to "'promot[e] private citizen involvement in exposing fraud against the government'" and to "'[prevent] parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud.'" *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173-74 (5th Cir. 2004) (quoting *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co.*, 336 F.3d 346, 351 (5th Cir. 2003)).

It is the language of 31 U.S.C. § 3730(e)(4) that has become the battleground for the conflicting views regarding just how broad or narrow Congress's grant of authority for federal qui tam suits filed by private citizens is. There is little dispute that the language of this statute has

> led to extensive litigation and to circuit splits concerning the meaning of the words "based upon," "public disclosure," "allegations or transactions," "original source," "direct and independent knowledge" and "information." Virtually every court of appeals that has considered the public disclosure bar explicitly or implicitly agrees on one thing, however: the language of the statute is not so plain as to clearly describe which cases Congress intended to bar.

*United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997).

## IV.

The Tennessee General Assembly has a long history of enacting statutes authorizing qui tam actions. For more than two centuries, it followed the traditional approach of enacting statutes providing a bounty to private plaintiffs who filed qui tam actions to enforce specific statutes while declining to adopt a generalized false claims provision similar to the Federal

---

[29](...continued)
original source of the information.

    (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C.A. § 3730(e)(4) (Oct. 2010 Supp.) (footnote omitted).

-14-

False Claims Act.[30]  However, in 2001, the General Assembly enacted the False Claims Act which, like its federal counterpart, targeted a much broader array of fraudulent activity perpetrated against state and local governments.[31]  Just as Congress did, the General

---

[30]*See*, *e.g.*, *Louisville & Nashville R. Co. v. Collier*, 104 Tenn. 189, 191, 54 S.W. 980, 981 (1900) (noting the availability of a qui tam action for failure to announce the name of a train station at a stop); *State v. Lookout Bank*, 89 Tenn. 278, 279, 14 S.W. 801, 801 (1890) (involving a qui tam action in response to purported usury); *Stanley v. Sharp*, 48 Tenn. (1 Heisk.) 417, 418 (1870) (addressing a qui tam action for altering a public road); *Greer v. Bumpass*, 8 Tenn. (Mart. & Yer.) 94, 94-95 (1827) (ruling upon a qui tam action based upon unlicensed peddling of goods).

[31]Pursuant to Tenn. Code Ann. § 4-18-103(a), Tennessee's False Claims Act applies to any person who

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property;

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision;

(8) Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim; or

(9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from

(continued...)

Assembly provided a statutory jurisdictional bar that is intended to encourage private citizens to assist state and local government in ferreting out fraud but, at the same time, to prevent parasitic plaintiffs from piggybacking on public disclosures of fraud to bring qui tam actions.

We accepted Knox County's application for permission to appeal to address the question of whether the jurisdictional bar in Tenn. Code Ann. § 4-18-104(d)(3)(A) prevents Environmental from recovering as a qui tam plaintiff under the facts of this case. The parties have invited us to answer this question by venturing into the imbroglio created by the conflicting interpretations of the federal False Claims Act's jurisdictional bar. While 31 U.S.C. § 3730(e)(4) is similar, particularly in its pre-2010 amendment form, to Tenn. Code Ann. § 4-18-104(d)(3), we are disinclined to survey the conflicting federal decisions to pick out decisions that most closely resemble this case and that are the best reasoned.

As interesting as these cases may be, they are not the proper starting point for construing Tenn. Code Ann. § 4-18-104(d)(3). We must begin with the words of the state statute. *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 176 (Tenn. 2008). Our goal is to ascertain and to give the fullest possible effect to the General Assembly's intent and purpose. *See Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 900 (Tenn. 2007); *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 534–35 (Tenn. 2004). To do so, we must (1) give these words their natural and ordinary meaning, (2) consider them in the context of the entire statute, and (3) presume that the General Assembly intended that each word be given full effect. *See Lanier v. Rains*, 229 S.W.3d 656, 661 (Tenn. 2007); *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). When a statute's language is clear and unambiguous, we need not look beyond the statute itself, *State v. Strode*, 232 S.W.3d 1, 9–10 (Tenn. 2007); *Corum v. Holston Health & Rehab. Ctr.*, 104 S.W.3d 451, 454 (Tenn. 2003), but rather, we must simply enforce it as written. *Wausau Ins. Co. v. Dorsett*, 172 S.W.3d 538, 543 (Tenn. 2005); *Miller v. Childress*, 21 Tenn. (2 Hum.) 319, 321–22 (1841). Thus, as Justice William Reese observed one hundred and seventy years ago, "[w]here a statute is plain and explicit in its meaning, and its enactment within the legislative competency, the duty of the courts is simple and obvious, namely, to say *sic lex scripta*,[32] and obey it." *Green*

---

[31](...continued)
the state or any political subdivision.

Tenn. Code Ann. § 4-18-103(a).

[32]The phrase "sic lex scripta" means "so is the law written." *Green v. Green*, 293 S.W.3d at 508 n.30 (quoting *Fed. Express Corp. v. Woods*, 569 S.W.2d 408, 411 (Tenn.1978)).

*v. Green*, 293 S.W.3d 493, 508 (Tenn. 2009) (quoting *Miller v. Childress*, 21 Tenn. (2 Hum.) at 321–22).[33]

The Tennessee False Claims Act provides, in part, that

> (A) No court shall have jurisdiction over an action under this chapter based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in an investigation, report, hearing, or audit conducted by or at the request of the general assembly, comptroller of the treasury, or governing body of a political subdivision, or by the news media, unless the action is brought by the attorney general and reporter or the prosecuting authority of a political subdivision or the person bringing the action is an original source of the information.

> (B) For purposes of subdivision (d)(3)(A), "original source" means an individual, who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subdivision (d)(3)(A).

---

[33]When state courts are called upon to interpret state constitutional provisions, statutes, rules, or regulations that have federal counterparts, it is not uncommon for them to consider and adopt the federal courts' interpretation of similar federal provisions. Doing so is appropriate when relying on federal authority is consistent with the General Assembly's express legislative intent. *See*, *e.g.*, Tenn. Code Ann. § 47–18–115 (2001) (stating that the Tennessee Consumer Protection Act should be "construed consistently" with the federal courts' interpretations of the Federal Trade Commission Act). It is also appropriate when doing so is consistent with the General Assembly's implicit intent. *See*, *e.g.*, *Bennett v. Steiner-Liff Iron & Metal Co.*, 826 S.W.2d 119, 121 (Tenn. 1992) (stating that the General Assembly intended the Tennessee Human Rights Act to "provide for the execution of the policies embodied in the federal civil rights acts of 1964, 1968, and 1972"). Because many of our procedural rules have been derived from federal procedural rules, we have also frequently considered the federal courts' interpretations of federal procedural rules that are analogous to our procedural rules. *See*, *e.g.*, *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 375 (Tenn. 2007). There are occasions, however, when it is neither necessary nor helpful for Tennessee courts to consider or adopt the federal courts' interpretation of federal statutes or rules that are similar to our own. For example, when the language of a Tennessee statute is clear and the statute can be interpreted and enforced as written, there is little need to consider or follow the federal courts' interpretation of similar federal provisions.

Tenn. Code Ann. § 4-18-104(d)(3)(A), (B).

The pivotal issue in this case is whether Environmental qualifies as an "original source" under Tenn. Code Ann. § 4-18-104(d)(3)(A) and (B). While the exact boundaries of this statute may be somewhat indistinct, we have little difficulty in concluding under the plain language of the statute that Environmental qualifies as an "original source" for the purposes of Tennessee's False Claims Act. To be an "original source," a qui tam plaintiff must (1) have direct and independent knowledge of the information on which the allegations referenced in Tenn. Code Ann. § 4-18-104(d)(3)(A) are based, (2) voluntarily provide this information to the state or political subdivision before filing an action based on that information, and (3) the information provided by the qui tam plaintiff must have provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in Tenn. Code Ann. § 4-18-104(d)(3)(A). Tenn. Code Ann. § 4-18-104(d)(3)(B).

Assuming, solely for the purpose of argument, that Environmental's qui tam case is based on the April 9, 2003 audit report rather than on its own report that Mr. McGehee provided to County officials in February 2001,[34] Environmental nevertheless qualifies as an "original source" under Tenn. Code Ann. § 4-18-104(d)(3)(A). It was never disputed that Mr. Howard was familiar with the termite control industry in Knoxville and that he knew Messrs. Swann and Thomas. After becoming suspicious of the billing practices of both Arrow and Allied, Mr. Howard hired an attorney and a private investigator, at considerable expense, to follow up on his suspicions. In addition to these expenditures, Environmental employees dedicated a considerable amount of staff time and other resources to review public records, notably invoices, payment records, and building diagrams.

Environmental's initial examination of the public records, which no County employee had undertaken, uncovered a consistent pattern of overbilling beginning in 1997. When Environmental's initial investigation was underway, there had been no public disclosure of the overbilling problem, nor had any administrative, civil, or criminal investigation or proceedings been commenced. It is undisputed that prior to receiving Environmental's February 2001 report, the overbilling uncovered by Environmental had gone entirely undetected by County employees.

While both Environmental and Knox County relied on public records in their independent investigations into the overbilling for termite services, none of the public documents turned over to Environmental during its investigation addressed overbilling.

---

[34]Environmental contends that its action is not "based upon" the Knox County of Department of Internal Audit's April 2003 report but instead on the findings in its own February 2001 report.

Instead, it was Environmental's diligent and thorough review of the seemingly innocuous public purchasing records that uncovered Arrow's and Allied's overbilling practices.

When Environmental laid out the fraudulent conduct of Arrow and Allied to the County officials in February 2001, it was Environmental, not Knox County, that had direct and independent knowledge of the overbilling practices. Based on the essentially undisputed facts of this case, Environmental did not rely on existing information from another investigation, report, hearing, or audit when it prepared its report that was presented to the County officials in February 2001.

Environmental supplied the information it had assembled to many different County officials and on many different occasions. It repeatedly urged the officials, particularly the County Law Director, to take steps to recover the County funds. It was the information provided by Environmental that triggered the internal audit that ultimately confirmed Environmental's findings. Accordingly, for the purpose of Tenn. Code Ann. § 4-18-104(d)(3)(B), it was the information provided by Environmental that provided "the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subdivision (d)(3)(A)."

Our conclusion is bolstered by the General Assembly's directive regarding the interpretation of the False Claims Act. Tenn. Code Ann. § 4-18-107(c) states that our Act is "remedial in nature and the provisions of this chapter shall be liberally construed to effectuate its purposes." We have concluded that Environmental qualifies as a proper qui tam plaintiff under the plain language of Tenn. Code Ann. § 4-18-104(d)(3)(A). That Environmental need only surmount the lower bar of a liberally constructed reading of Tenn. Code Ann. § 4-18-104(d)(3)(A) reinforces our conclusion that the lower courts did not err in finding that Environmental qualified as an appropriate qui tam plaintiff.

The legislative history of Tennessee's False Claims Act also supports our conclusion. Representative Rob Briley, the Act's sponsor in the House of Representatives, explained that the Act would empower "do gooders," who are "trying to protect . . . taxpayer dollars by identifying false claims."[35] Summarizing the measure before final passage in the House of Representatives, Representative Briley explained that the purpose of the Act "is to prevent fraud on the government. Often times private citizens are the only ones who have knowledge

---

[35] Statement of Representative Rob Briley, House Judiciary Committee, Apr. 18, 2001.

of that fraudulent behavior. This would create a mechanism where they could bring that to the attention of the government."[36]

This exact purpose was served in the present case. As reflected in the trial court's September 10, 2007 ruling, "[Knox] County does not maintain that it was aware of the fraud prior to the disclosure by Environmental." The trial court also found that "[t]he overwhelming proof in this case indicates that the overbilling would not have been discovered without the qui tam plaintiff's pre-litigation investigation and report to the government. Indeed, it is highly likely that the practice would continue to the present resulting in additional losses to the County." There is certainly a need, as recognized in Tenn. Code Ann. § 4-18-104(d)(3)(A), to balance the goal of enlisting public assistance against the danger of being overrun by those who would take the credit without doing any of the work. However, we have little difficulty in concluding that Environmental has acted as a private entity that successfully uncovered the fraud that was being committed against the County, rather than a parasitic plaintiff that was a latecomer arriving just in time to piggyback on the government's investigation into or findings of fraud.

## V.

For the reasons discussed above, we affirm the conclusion of the trial court and the Court of Appeals that Environmental qualifies as a proper qui tam plaintiff under the Tennessee False Claims Act. We remand this case to the trial court for further proceedings consistent with this opinion and the opinion of the Court of Appeals upon the issues not raised on appeal before this Court. We tax the costs of this appeal to Knox County for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE

---

[36]Statement of Representative Rob Briley, House Session, May 24, 2001. Testimony before the Senate Judiciary Committee addressing the Tennessee False Claims Act characterized Tennessee's qui tam provision as a "finder's fee." Testimony of Michael Ruble, Senate Judiciary Committee, Apr. 27, 2004.