IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 2017 Session


**STARLINK LOGISTICS, INC. v. ACC, LLC, ET AL.**


**Appeal from the Chancery Court for Davidson County**
**No. 121435II          Carol L. McCoy, Chancellor**

_____

**No. M2014-00362-COA-R3-CV**
_____


In this case, several entities were attempting to address the pollution issues of Sugar Creek and Arrow Lake. An Amended and Restated Consent Order was approved. StarLink Logistics, Inc., a property owner, appealed. Initially, this court reversed. After an appeal, the Supreme Court of Tennessee remanded for this court to review under the proper standard of review. We now affirm the trial court's decision to approve the Consent Order.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**


JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and W. NEAL MCBRAYER, J., joined.

William L. Campbell, Jr., Nashville, Tennessee; Sheryl G. Snyder, Louisville, Kentucky; and Wm. T. Robinson, III, Christopher S. Habel, and Stephen N. Haughey, Cincinnati, Ohio, for the appellant, StarLink Logistics, Inc.

Sharon O. Jacobs and C. David Briley, Nashville, Tennessee, and Thomas W. Hardin and Kori A. Bledsoe, Columbia, Tennessee, for the appellee, ACC, LLC.

Herbert H. Slatery, II, Attorney General and Reporter; Andree S. Blumstein, Solicitor General; and Elizabeth P. McCarter, Senior Counsel, for the appellee, Tennessee Solid Waste Disposal Control Board.

Donald Capparella and Elizabeth Sitgreaves, Nashville, Tennessee, for the Amici Curiae, Claude T. Brawner, Eldon R. Cummins, Sara J. Cummins, W. Dwight Green, James Earl Jones, Leslie Liles, Gail P. McCain, Morris Ray McCain, and Larry Patton.

**OPINION**

**I. BACKGROUND**

While the development of this case is complicated and intricate, the underlying facts are not in dispute between the parties. Even though most of the history of this suit involves ACC, LLC ("ACC") and the Tennessee Department of Environment and Conservation ("TDEC"), StarLink Logistics, Inc. ("StarLink") has no issues with or opinions of the history preceding its involvement.

In 1981, the State of Tennessee through TDEC issued ACC a permit to construct and operate a landfill in Maury County. The landfill was built on approximately 14 acres of a larger parcel owned by ACC. During the landfill's 13 years of active operation, ACC disposed of aluminum recycling waste from a nearby aluminum smelting plant. This waste included mostly bag-house dusts and "salt cake" slag, which contains high concentrations of sodium chloride and potassium chloride salts. ACC closed the landfill in 1993 and submitted a certification of completion of closure to TDEC in 1995, which was approved with an acceptance of closure by TDEC in 1996.

Within a few years of beginning operation, ACC and TDEC learned that the landfill was leaching high levels of chloride and ammonia from the slag into the groundwater and surface water that drained into Sugar Creek and Arrow Lake, which is on 1,500 acres owned by StarLink. This leachate resulted in the pollution of those two bodies of water. Both ACC and TDEC worked to find a solution to the leaching, including various investigative and corrective efforts, but they were unsuccessful. As a result of this pollution, ACC was found to have violated Tennessee Code Annotated sections 69-3-108(a) and (b), 69-3-114(a) and (b), and 68-211-104(1), (3), and (4).[1]

---

[1]Tennessee Code Annotated sections 69-3-108(a) and (b) (2012) provide under the Tennessee Water Quality Control Act:

> (a) Every person who is or is planning to carry on any of the activities outlined in subsection (b), other than a person who discharges into a publicly owned treatment works or who is a domestic discharger into a privately owned treatment works, or who is regulated under a general permit as described in subsection (l), shall file an application for a permit with the commissioner or, when necessary, for modification of such person's existing permit.
>
> (b) It is unlawful for any person, other than a person who discharges into a publicly owned treatment works or a person who is a domestic discharger into a privately owned treatment works, to carry out any of the following activities, except in accordance with the conditions of a valid permit:

It was not until 2003 that TDEC requested that ACC provide a Corrective Action Plan ("the Plan") detailing the feasibility of various options for mitigating the release of contaminated leachate based on the information available. These options included waste removal from the landfill, leachate collection and treatment, and natural or enhanced site attenuation. However, the Plan ultimately concluded that there was no remedy that could satisfy the criteria in Tennessee Compilation of Rules and Regulations Chapter 1200-1-7-.04(7)(a)8(ii)[2] within the next two to three years. In 2004, TDEC did then approve ACC's plan to build a "Wetlands Treatment Alternative" that would retain and buffer leachate and improve the water quality and habitat of the affected waters. However, this

---

        (1) The alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state;

        (2) The construction, installation, modification, or operation of any treatment works, or part thereof, or any extension or addition thereto;

…

        (6) The discharge of sewage, industrial wastes or other wastes into waters, or a location from which it is likely that the discharged substance will move into waters[.]

T.C.A. § 69-3-114(a) and (b) (2012) provide under the Tennessee Water Quality Control Act:

        (a) It is unlawful for any person to discharge any substance into the waters of the state or to place or cause any substance to be placed in any location where such substances, either by themselves or in combination with others, cause any of the damages as defined in § 69-3-103, unless such discharge shall be due to an unavoidable accident or unless such action has been properly authorized. Any such action is declared to be a public nuisance.

        (b) In addition, it is unlawful for any person to act in a manner or degree which is violative of any provision of this part or of any permits or orders issued pursuant to the provisions of this part; or to fail or refuse to file an application for a permit as required in § 69-3-108….

T.C.A. § 68-211-104(1), (3), and (4) provide under the Tennessee Solid Waste Disposal Act that it is unlawful to:

        (1) Place or deposit any solid waste into the waters of the state except in a manner approved by the department or the Tennessee board of water, quality, oil and gas;

        (3) Construct, alter, or operate a solid waste processing or disposal facility or site in violation of the rules, regulations, or orders of the commissioner or in such a manner as to create a public nuisance; or

        (4) Transport, process or dispose of solid waste in violation of this chapter, the rules and regulations established under this chapter or in violation of the orders of the commissioner or board.

[2]"Remedies must: (I) Be protective of human health and the environment, (II) Attain the groundwater protection standard as specified pursuant to Rule 1200-01-07-.04(7)(a)1 of this rule, (III) Control the source(s) of releases so as to reduce or eliminate, to the maximum extent practicable, further releases of Appendix II constituents into the environment that may pose a threat to human health or the environment, and (IV) Comply with standards for management of wastes as specified in subpart (IV) of part 9 of this subparagraph."

system failed to stop the pollution into Arrow Lake and Sugar Creek.

After the wetlands failure, in 2008, TDEC requested that ACC submit a modified plan to address the increase in contaminants in the groundwater. Later that year, ACC submitted a modified plan ("the Modified Plan") that TDEC approved in 2010. This Modified Plan included a report that detailed ACC's efforts since April 2010. It also included a request that TDEC clarify the corrective action goals, summarize the current site conditions, and other general actions. The Modified Plan led to a series of meetings and inspections in determining the best next steps for ACC to take in stopping the pollution from its landfill.

In June 2011, ACC and TDEC entered into an Initial Consent Order that acknowledged that ACC was in violation of the Tennessee Water Quality Control Act[3] ("WQCA") and the Tennessee Solid Waste Disposal Act[4] ("SWDA") and set forth ACC's obligations in moving forward to address the continued contamination. As specified in the order, ACC agreed to submit a new plan to reduce the contamination stemming from its landfill. This order gave the TDEC Commissioner permission to modify future plans and extend compliance deadlines for a show of "good cause." The civil penalty of $228,300 would only become due if ACC failed to file and implement the plans called for by the order. The order could also be waived in its entirety by the TDEC Commissioner for demonstrated good cause by ACC. This order was filed for entry as a judgment by consent in the Davidson County Chancery Court.[5] At this point, StarLink intervened and objected to the initial consent order.

After failing to resolve the issues themselves among the three parties, the Chancery Court remanded the order back to the Tennessee Solid Waste Disposal Control Board ("the Board") for further proceedings. StarLink was given specific notice that ACC and TDEC would be asking for adoption of an Amended and Restated Consent Order ("the Amended Order") that had different orders and assessments from the Commissioner. In relevant part, ACC was ordered as follows:

A. [ACC] shall take the following actions to prevent the unauthorized discharge of leachate contamination in water flowing from the [landfill] Site into the Arrow Lake impoundment of Sugar Creek:

1. Within 120 days of the effective date of this Amended and Restated Consent Order, or as is otherwise agreed to by the parties, [ACC] shall construct a berm upgradient of the site to divert

---

[3]Tenn. Code Ann. §§ 69-3-101 to -148 (2011).
[4]Tenn. Code Ann. §§ 68-211-101 to -124 (2011).
[5]Pursuant to Tenn. Code Ann. § 68-212-114(e) (2011), § 68-212-215(f) (2011), and § 69-3-115(e) (2004 & Supp. 2011).

uncontaminated storm water away from the Landfill prior to the commencement of any corrective action activities on the Landfill.

2. As a part of the Corrective Action Plan [("CAP")]…[ACC] shall submit to the Commissioner for his review and comment or approval a modified Discharge Reduction Plan (hereinafter "DRP") that incorporates TDEC's comments and revisions to [ACC's] draft DRP that was submitted to TDEC in September 2011.  The modified DRP shall significantly reduce, particularly during periods of low area surface water flow, the loading of contaminants that are currently discharging from the Site via surface waters.  The modified DRP shall include a schedule for implementation.

3. The DRP shall contain a plan to divert surface water away from the landfill area and the current wetland system.  The DRP shall eliminate, to the extent practicable, the potential for surface water to migrate from the surface into the landfill and eliminate the potential for surface water to enter the excavated area of the landfill once corrective action begins.
…
B. [ACC] shall remove from the current landfill all solid waste, to the extent practicable, that has the potential for future contact with ground or surface water. All waste removed will be located to a new landfill cell constructed on the Site or to a permitted off-site landfill.

1. Prior to the Commissioner's approval of the Corrective Action Plan… but after commencement of waste removal activities, [ACC] shall capture ground water entering the excavated area, analyze the ground water to determine its chemical characteristics, and then either (a) redirect the collected water back into the landfill or (b) discharge the collected ground water directly into Arrow Lake if the water is consistent with background concentrations as approved by TDEC [or] Tennessee water quality criteria[.]

2. After the Corrective Action Plan…has been approved by the Commissioner, a list of constituents, their concentrations, and frequency of analysis shall follow the sampling plan contained in the approved Water Monitoring Plan as contained in the approved CAP[.]

3. As waste is removed from the Site, [ACC] shall capture ground water that is upgradient of the remaining waste and handle such ground water as described in the approved DRP, or as is otherwise

required by the CAP. Treatment, transport or disposal of water is not required pursuant to this Order until the TDEC approved CAP has been completed.

C. Within one hundred and fifty (150) days of the effective date of this Amended and Restated Consent Order, [ACC] in general accordance with the ground water corrective action provisions of Rule 1200-01-07-.04(7), shall submit to the Department a Corrective Action Plan… which provides for the methods and schedule for removal of solid wastes that have been disposed of in the ACC Landfill which have the potential for future contact with surface or groundwater.

The Amended Order, which is the point of contention in this case, requires ACC to detail an estimate of the amount of waste to be removed daily and proposed methods of removal, a schedule for the removal and relocation of all impacted waste, the design of any landfill cell to be built on site, the development and implementation of a water monitoring and sampling plan for the leachate discharging from the landfill and for any ground water pumped from the worksite. As with the original order, the plan can be modified upon written approval of the Commissioner and ACC, and the Commissioner may extend the compliance dates if ACC provides a written request. The Amended Order requires a civil penalty of $400,000 that comes due in $100,000 increments yearly if ACC fails to meet milestone deadlines established in the CAP for removing waste from the ACC Landfill.

At the contested hearing in front of the Board on August 7, 2012, TDEC and ACC asserted that diverting the storm water away from the site and subsequently removing the waste from the landfill was the only practical solution to solve the contamination. StarLink argued that the plan did not adequately address the leachate still leaking into Sugar Creek and StarLink's property. The Board entered an order approving the Amended Order two days later. After StarLink appealed by filing a petition for judicial review in the Chancery Court and subsequent oral argument, the court entered an order affirming the Board's decision approving the Amended Order.

On the initial appeal to this court, we found in favor of StarLink after deciding on an issue we raised: that the Board failed to fully consider another feasible and potentially economically viable plan. The Supreme Court reversed, finding that we did not properly apply the narrow standard of review required for judicial review of agency decisions. Accordingly, the case was remanded back to this court to properly apply the standard of review.

## II. ISSUES ON APPEAL

On appeal and remand, StarLink asserts two related issues. First, we must address whether the Amended Order violates statutory provisions, specifically by not requiring that ACC obtain a NPDES permit for its continued leachate discharges. Second, we must also decide whether this action is outside of the authority of both the TDEC and the Commissioner under the Tennessee Hazardous Waste Management Act.

## III. STANDARD OF REVIEW

Judicial review of an agency's action follows a more statutorily specific standard than the de novo standard of review that is typical of most civil cases. *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). In reviewing an agency's decision, the court must follow Tennessee Code Annotated section 4-5-322(h). We may only reverse or modify the decision of the agency if the Board's finding is:

1. In violation of constitutional or statutory provisions;

2. In excess of the statutory authority of the agency;

3. Made upon unlawful procedure;

4. Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

5.(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h)(1)-(5) (2011). This court has the same scope of review as the trial court, which is to "review findings of fact of the administrative agency upon the standard of substantial material and evidence." *Methodist Healthcare-Jackson Hosp. v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 129 S.W.3d 57, 63 (Tenn. Ct. App. 2003). Even if the administrative body could have found a different result, the reviewing court must still follow the agency as to the weight of the evidence. *Wayne Cnty.*, 756 S.W.2d at 279 (citing *Hughes v. Bd. of Comm'rs*, 319 S.W.2d 481, 484 (Tenn. 1958)).

# IV. DISCUSSION

As previously noted, this is not a case debating the facts of the landfill owned by ACC polluting the surrounding land and waterways. Both parties involved acknowledge the violations under the Tennessee Water Quality Control Act. This suit, instead, handles the conflict surrounding the Amended Consent Order that was approved by the Tennessee Solid Waste Disposal Control Board detailing the necessary actions to be taken by ACC as a result of such violation.

## A. NPDES Permit

In resolving the issues in this appeal, persuasive weight is given to the decision made by TDEC and the Board, as they are charged with enforcing the WQCA.[6] Only when the court determines an interpretation by the Board to be "erroneous" will the court be "impelled to depart from it."[7] The burden is on StarLink to prove that clear error as they are the party seeking relief.[8] In this case, the court finds that the Board's interpretation in creating the Amended Consent Order was not erroneous.

StarLink's argument rests on the necessity to follow the federal Clean Water Act ("CWA") and the federal precedent surrounding the statute. Under the CWA, those with allegations of pollution must either stop the actions that are causing the pollution or

---

[6]*See Consumer Advocate Div. v. Greer*, 967 S.W.2d 759, 761 (Tenn. 1998) ("[A] state agency's interpretation of a statute that the agency is charged to enforce is entitled to great weight in determining legislative intent."); *Nashville Mobilphone Co. Inc. v. Atkins*, 536 S.W.2d 335, 340 (Tenn. 1976) ("[T]hey urged upon us the general rule that weight and importance are given by the Tennessee courts to the interpretation of the agency charged with the enforcement or administration of a particular act. We agree that such an interpretation is entitled to consideration and respect and should be awarded appropriate weight, and this is particularly true in the interpretation of doubtful or ambiguous statutes.").

[7]*Nashville Mobilphone*, 536 S.W.2d at 340 (quoting *Collins v. McCanless*, 169 S.W.2d 850, 853 (Tenn. 1943)). *See also BellSouth v. Tennessee Reg. Auth.*, 79 S.W.3d 506, 514 (Tenn. 2002) (quoting *Jackson Express, Inc. v. Tennessee Pub. Serv. Comm.*, 679 S.W.2d 942, 945 (Tenn. 1984) ("Generally, courts must give great deference and controlling weight to an agency's interpretation of its own rules. A strict standard of review applies in interpreting an administrative regulation, and the administrative interpretation becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (internal quotation marks omitted).

[8]*Big Fork Mining Co. v. Tennessee Water Quality Control Bd.*, 620 S.W.2d 515, 520 (Tenn. Ct. App. 1981) ("In administrative proceedings, the burden of proof ordinarily rests on the one seeking relief, benefits, or privilege… Further, it is well established in Tennessee case law that the burden of proof is on the party having the affirmative of an issue, and that burden does not shift." *See also Pack v. Royal-Globe Ins. Co.*, 457 S.W.2d 19 (Tenn. 1970); *Freeman v. Felts*, 344 S.W.2d 550 (Tenn. 1961).

obtain a National Pollutant Discharge Elimination System ("NPDES") permit to limit and monitor the amount of pollutant released into the waterway in question.[9] StarLink argues that the Amended Order ignores the only two options open to a pollutant by permitting ACC to continue the harmful behavior of allowing the leachate to seep into Sugar Creek and Arrow Lake without the oversight of a NPDES permit. StarLink bases this argument on several federal cases that focus on the necessity of a NPDES permit when a person or entity is in conflict with the CWA.[10] However, StarLink presents no evidence of any state cases dictating the same necessity.

In the case of similar federal and state laws, here the federal CWA and the WQCA, courts may adopt the interpretation of the federal statutes from federal courts when considering the state statutes.[11] However, "although federal judicial decisions 'interpreting rules similar to our own are persuasive authority for purposes of construing the Tennessee rule,' they 'are non-binding even when the state and federal rules are identical.'"[12] The court must also take into account the legislative intent in the language of the statute itself, considering the words with the natural and ordinary meaning within the context of the statute, "presum[ing] that the General Assembly intended that each word be given full effect."[13] Therefore, "when the language of a Tennessee statute is clear and the statute can be interpreted and enforced as written, there is little need to consider or follow the federal courts' interpretation of similar federal provisions."[14] StarLink's reliance on the federal law and interpretations of the federal CWA in this case was misguided.

StarLink fails to take into consideration the language of the similar state statute, the WQCA. This applicable statute provides:

---

[9] 33 U.S.C. § 1342. This statute also acknowledges that each state may also establish its own permit program in compliance with the NPDES. 33 U.S.C. § 1342(b). In *Pickard v. Tennessee Water Quality Control Bd.*, the Tennessee Supreme Court recognized that any discharge permit issued by TDEC falls under the NPDES permit system. 424 S.W.3d 511, 514 n.1 (Tenn. 2013).

[10] *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981), *United States v. Velsicol Chem. Corp.*, 438 F. Supp. 945 (W.D. Tenn. 1976).

[11] *Knox Cnty. ex rel. Envtl. Termite & Pest Control, Inc. v. Arrow Exterminators, Inc.*, 350 S.W.3d 511, 524 n.33 (Tenn. 2011).

[12] *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 430 (Tenn. 2011) (quoting *Harris v. Chem*, 33 S.W.3d 741, 745 n.2 (Tenn. 2000)). *See also Bowman v. Henard*, 547 S.W.2d 527, 530 (Tenn. 1977) ("The Supreme Courts of the respective states are bound only by decisions of the Supreme Court of the United States when that Court holds that a given course of conduct is unconstitutional under the federal constitution. The opinions of the other courts of the federal system are persuasive, but not controlling.")

[13] *Knox Cnty.*, 350 SW.3d at 524.

[14] *Id.* at 524 n. 33.

The commissioner *may* grant permits authorizing the discharges or activities described in subsection (b), including, but not limited to, land application of wastewater, but in granting such permits shall impose such conditions, including effluent standards and conditions and terms of periodic review, as are necessary to accomplish the purposes of this part, and as are not inconsistent with the regulations promulgated by the board. *Under no circumstances shall the commissioner issue a permit for an activity that would cause a condition of pollution either by itself or in combination with others.*[15]

The wording of this statute can be read to give leniency in granting permits, putting the decision in the hands of the Commissioner. While StarLink argues that courts have previously held that the similar language in the federal CWA cannot be read this way, there is no precedent from the Supreme Court of the United States nor courts in Tennessee interpreting this language of the WQCA. With the deference given to TDEC and the Board, the lack of a necessity to follow the federal law, and no direct state precedent in conflict with the decision, this Court finds that the Board's interpretation of the statute is not inconsistent with the regulation.

The statute also places strict limits on the Commissioner in terms of the permitted activity causing or continuing to cause a condition of pollution. In this case, issuing a permit for the activity which StarLink claims is necessary (the leachate flowing from ACC's property into Sugar Creek and Arrow Lake) would actually be in direct conflict with the language of the statute. Without any mitigating efforts, the leachate would still be causing a condition of pollution into Sugar Creek and Arrow Lake. For this situation, the Board properly focused on minimizing the amount of storm water entering the landfill and removing the source of the pollution, the salt cake slag, from the landfill. By doing so, the Board attempted to reduce the amount of leachate leaving ACC's property by concentrating on a solution to the pollution rather than simply monitoring it with the permit. This plan of action was more in line with the legislation's purpose and intent in creating the WQCA.[16]

In addition, the Amended Order included a schedule for the removal of the salt cake slag as well as a time frame for subsequent reassessment of the actions needed once the source of the pollution has been removed. Despite what StarLink contends, the

---

[15]Tenn. Code. Ann. § 69-3-108(g) (emphasis added).

[16]Tenn. Code Ann. § 69-3-102. As a declaration of policy and purpose, the WQCA seeks to "Abate existing pollution of the waters of Tennessee, to reclaim polluted waters, to prevent the future pollution of the waters, and to plan for the future use of the waters so that the water resources of Tennessee might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters." Tenn. Code Ann. § 69-3-102(b).

Amended Order does not allow for an indefinite discharge of leachate without any oversight. There is no statutory requirement for a timeframe in which ACC would be required to treat the discharged leachate. As discussed in the hearing before the Board, there was no practical or cost effective option to treat the sodium chloride and potassium chloride leaching from the landfill before removing the salt cake slag. The Amended Order does address the possibility for the remaining leachate to be treated once the cause of the pollution has been removed from the site, and it is more economically practical.

StarLink also emphasizes the publication aspect of the NPDES permit as a necessity of the process. However, the Amended Order was published in the local newspaper, which would fill the same role of notification as the publication of the NPDES permit. StarLink does not even dispute that it had notice of the Amended Order and the opportunity to participate in the hearing surrounding it.

## B. Authorization of the Commissioner and TDEC

StarLink further argues that the Commissioner and subsequently TDEC do not have the authority under the Tennessee Hazardous Waste Management Act ("HWMA") to implement the remedy provided in the Amended Order. This argument again relies on the necessity of a NPDES permit as determined by the federal interpretation of the CWA. Instead, as discussed previously, the Board was not obligated to apply federal law and was not in error in applying the state law of the WQCA, the HWMA, and the SWDA.

Specifically, the Board had the latitude to exempt ACC from the typical requirement of the NPDES permit. One of the main requirements of the permit is to include technology-based effluent limits based on the water quality standards as well as the monitoring and reporting requirements to keep those limits in check.[17] However, based on testimony by George Garden presented during the initial phase of this litigation, it would not be feasible to impose such limitations on the ACC landfill due to the high salt content.[18] ACC would not be able to meet the effluent limit requirements of the permit without first removing the salt cake slag. The HWMA allows the Commissioner to "[i]ssue an order to any liable or potentially liable party requiring such party to contain, clean up, monitor and maintain inactive hazardous substance sites" in taking into consideration the technological feasibility and cost-effectiveness of each alternative in selecting containment and clean up actions.[19] The SWDA also authorizes the Commissioner to issue "order for corrections" when the Act is being violated.[20] Combined with the language of the WQCA allowing the discharge of a substance if "such

---

[17]33 U.S.C. §§ 1311 and 1318.
[18]AR II, p. 142, lines 10-18; AR II, p. 144, lines 2-17.
[19]Tenn. Code Ann. § 68-212-206(a)(3) and (d)(1).
[20]Tenn. Code Ann. § 68-211-112.

action has been properly authorized,"[21] the Board was not in violation of Tennessee Code Annotated section 69-3-108 in requiring a permit nor the HWMA, because it is properly authorized.

While StarLink's argument relying on federal law may have been persuasive, their reliance on such law is misguided. Neither the Board nor this Court are obligated to follow such precedent when the similar state law can be interpreted using plain language and legislative intent. Based on the language of the various statutes, the Board and the Chancery Court had the authority and were not in error in approving the Amended Consent Order without the requirement of a NPDES permit.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, StarLink Logistics, Inc.

_____
JOHN W. MCCLARTY, JUDGE

---

[21]Tenn. Code Ann. § 69-3-114(a).